## MIDMER *vs.* MIDMER'S EXECUTORS.

1. A resulting trust can only arise at the time of the execution of the deed; it cannot be raised from matter arising *ex post facto*.

2. If a suitor makes one case by his bill, and proves another, he must obtain leave to amend, or fail.

3. This court has the power to order an amendment, on final hearing, but it is never exercised except where the ends of justice render it necessary, and it can be done without substantially abridging the right of defence.

4. Where the object of the suit is not of a character to commend it to the favorable consideration of the court, and the proofs fail to convince the judgment of the court that the complainant is entitled to any relief, leave to amend, at the final hearing, will be refused.

5. In such a case, if the complainant intended to rely upon the case made by his proofs, application for leave to amend should have been made promptly.

6. Nothing short of certain, definite, reliable and convincing proof, will justify the court in divesting one man of title to lands, evidenced by a regular deed, and putting it in another.

7. Parol proof of oral admissions of an alleged trustee, is admissible, even after his death, to establish a resulting trust. But the proof must be of the most convincing kind.

8. Delay in asserting the claim is an important circumstance in determining whether there is a trust or not.

9. A resulting trust cannot be established upon oral admissions of the alleged trustee, made more than fifteen years before the witnesses attempted to repeat them; the witnesses having no special interest in them, and having made no effort to retain them; and there being no confirmatory evidence of any description.

10. A delay of twenty years in bringing suit to establish a resulting trust, and until after the alleged trustee is dead; and when the parties seeking to establish the trust, in the presence of the alleged trustee, shortly before his death, heard his will read, and knew that the disposition of the land, made by the will, was inconsistent with their claim, and if the claim was enforced, it would defeat the scheme of the will; is fatal to the suit.

On bill, answer and proofs.

*Mr. Gilbert Collins,* for complainant.

*Mr. Thomas N. McCarter,* for defendants.

THE VICE-CHANCELLOR.

This action is brought to establish and enforce a resulting trust in favor of Henry Midmer, Eliza Anderson, and William Midmer, and against the executors of John H. Midmer, deceased, to certain lands situate in the county of Hudson. The lands in controversy were, by the will of the testator, devised in trust, to his widow Theodosia Ann, his brother William, and his friend Leon Abbett, who are the executrix and executors thereof, and also the defendants in this suit. Henry and William were brothers of John, and Eliza was his sister. The bill is filed by Henry and Eliza, and her husband. William is a defendant, but was made so only because he happened to be an executor, and proved the will; his interests, feelings and labors have all been with the complainants, notwithstanding the pledge of fidelity he gave to his brother's estate, in proving the will. The bill avers, John H. Midmer,

on the 8th day of August, 1853, acquired title to the lands in controversy by conveyance from Jacob M. Merseles, pursuant to an understanding with his two brothers and sister, whereby it was agreed he should pay for the lands with money which had been realized from the sale of property owned in common, in equal shares, by John and his two brothers and sister, take title in his own name, and hold them as trustee for himself, his brother and sister, in equal shares. John H. Midmer died September 17th, 1872. His will, bearing date August 3d, 1872, was admitted to probate October 11th, 1872. The bill in this case was filed July 12th, 1872, nearly twenty years after the alleged trust arose, and nearly a year after the making of the will.

The case designed to be made by the proofs of the complainants, differs, fundamentally, from that laid in the bill. The attempt to show, by proof of John H. Midmer's admissions and declarations, made quite twenty years prior to the examination of the witnesses, that in 1851 or 1852 (the deed is dated November 1st, 1851, and acknowledged August 9th and 11th, 1852,) he purchased a house and lot situate in Twenty-eighth street, New York city, paid for it with money belonging to his mother, and took title in his own name, contrary to his mother's instruction. The language of the witness, Joseph Hilton, who was examined December 31st, 1873, more than twenty years after the date of the conveyance, is: "Before his mother's death he told me he bought it with his mother's money, and she supposed it was in her name; that there was not much, and, by keeping it all together, he could make something, and it would be better for all concerned. He said his mother gave him the money to buy the house and lot, and that he had bought it in his own name, for fear some of the heirs would squander it, if it was divided." The mother died in 1852, but in what month, whether before or after the date of the acknowledgment of the deed to Midmer, is not shown. The father died in 1847. It is proved the house and lot in Twenty-eighth street was conveyed by Midmer to Michael Hart, November 10th, 1853;

that he received, in payment, stock of the Third Avenue Railroad Company, and that he exchanged some of this stock for the lands in controversy.

It will thus be seen, the complainants, by their proofs at least, put their claim to an adjudication that these lands are held in trust for them, distinctly on the ground that their brother John held the Twenty-eighth street lot in trust for their mother; that the lands in controversy were purchased with the proceeds of the sale of the Twenty-eighth street lot, and are therefore held subject to the same trust; and that they, as three of the heirs-at-law of Mrs. Midmer, are entitled to have the trust executed in their favor, to the extent of three-fourths of these lands.

In my judgment, the rights of the litigants in this suit must be determined by the effect which shall be given by the court, under the proofs, to the deed for the Twenty-eighth street lot. If this evidence does not clearly demonstrate a trust in favor of Mrs. Midmer, to that lot, arising at the time of the execution of that deed, none can be declared in favor of the complainants. Nothing is better settled than that a resulting trust can only arise at the time of the execution of the deed; it cannot be raised from matter arising *ex post facto*. *Cutler* v. *Tuttle*, 4 *C. E. Green* 562; *Tunnard* v. *Littell*, 8 *C. E. Green* 267. If the money which paid for the Twenty-eighth street lot was not the money of the mother, or if John received it as a loan, or an advancement from his mother, there was no resulting trust in favor of the mother, and the complainants have no case. Their right to the lands in controversy hinges entirely upon the question whether their mother had a right to a conveyance of the Twenty-eighth street lot; if that was not held in trust for her, these lands are not held in trust for the complainants.

It will be seen at a glance, the case attempted to be proved is so widely different from that set up in the bill, that no relief can be given, unless the pleadings are amended so as to raise a new and different issue, or pushed aside as useless machinery. They cannot be pushed aside. If a suitor

makes one case by his bill, and proves another, he must obtain leave to amend, or fail. *Andrews* v. *Farnham,* 2 *Stockt.* 94; *Howell* v. *Sebring,* 1 *McCarter* 90. Leave was asked on the hearing, to amend. The application was resisted by the defendants. Undoubtedly, the court has power to order an amendment on final hearing, but it is never exercised, except where the ends of justice render it necessary, and it can be done without substantially abridging the right of defence. In this case, if an amendment was permitted at this time, unless the defendants were afforded an opportunity to make defence to the new case—to put in their evidence upon the new issue—there would be an actual denial of the right of defence. It is obvious, leave to amend, under such circumstances, should be refused, unless the refusal will work great and manifest injustice. It should be remarked in this connection, the opportunity and means of information of the complainants respecting their case, when contrasted with those of their adversaries, do not, in my judgment, give them a right to extraordinary indulgence. They are seeking to establish a stale claim to a part of their dead brother's lands. In making their case they have had the aid of a living brother, who pretends not only to have been perfectly familiar with the transaction out of which their rights arose, but as one of the legal representatives of the dead brother, has had a right to inspect every paper, pry into every book, and examine every source of proof to be found among the dead man's effects. With such means of information at their command, it seems to me the complainants were bound to have been perfectly familiar with the foundation and history of their claim before exhibiting it formally in court. Besides, they were apprised on the 31st of December, 1873, by the evidence of their witness, Mr. Hilton, of the origin and nature of their claim. He was the first witness examined. If they intended to rely upon the case made by their proofs, application for leave to amend should have been made promptly; if allowed, the defendants would have been afforded a full and fair opportunity to contest the new issue.

If the proofs of the complainants established a case which, in my judgment, entitled them to relief, I should be inclined to give them an opportunity to obtain it in this suit, upon such terms as would allow the defendants the full right of defence, or otherwise to dismiss their bill without prejudice to a new action; but the proofs fail to convince my judgment that the complainants are entitled to any relief.

The effort always is, in cases of this class, to overcome and destroy a regular, formal, written title, by showing, by evidence less solemn and trustworthy than the written instrument itself, that though the deed says the purchase money was paid by A, and the lands were conveyed to him for his own use and benefit, yet, in truth, he did not pay the purchase money, but it was paid by B, and the conveyance was not made to A, for his own use and benefit, but to him in trust for B. To make such an effort successful, the law, for the safety of titles, requires that the proof shall be of the most convincing and satisfactory kind. Nothing short of certain, definite, reliable, and convincing proof, will justify the court in divesting one man of title to lands, evidenced by a regular deed, and putting it in another. *Cutler* v. *Tuttle*, 4 *C. E. Green*, 560; *Boyd* v. *McLean*, 1 *Johns. Ch.* 590; *Lench* v. *Lench*, 10 *Vesey* 517.

In this case, the trust arose more than twenty years before suit brought. If the complainants had had the legal title, their right of entry would now be barred by statutory provision, unless its operation had been suspended by disability. They do not assert their claim until after the death of the alleged trustee, when it is impossible for him to meet it, either by denial or explanation. This delay, according to the views of a very respectable elementary writer, would, of itself, be sufficient to overthrow their claim, for he held, parol proof could not be admitted after the death of the alleged trustee, to prove a resulting trust. *Sanders on Uses and Trusts* 127, 134. Another goes even further, and denies that a resulting trust can, in any case, be established by parol proof of the oral admissions of the alleged trustee. *Roberts*

on *Frauds*, 100. These views are no longer regarded as sound. Parol proof of oral admissions is now admissible, even after the death of the alleged trustee, to establish a resulting trust. *Boyd* v. *McLean, supra; Freeman* v. *Kelly*, 1 *Hoffman's Ch.* 98. Delay in asserting the claim is, however, regarded as an important circumstance in determining whether there is a trust or not. In *Delane* v. *Delane*, 4 *Brown's P. C.* 258, where both parties were living, though the proof established the trust, the claim was rejected as stale, there having been an acquiescence of seventeen years under a denial of the trust, and possession against it.

Added to the great delay shown in this case, it is in evidence that the complainants were all present when the alleged trustee executed his will, some seven weeks before his death ; the will was read in their presence ; they knew the land, to which they are now asserting title, was, by special designation, devised to the executors, with direction to hold it as long as they might deem it advisable, in the expectation of its increasing in value. They also knew, that if the claim they now make was well founded, its enforcement would utterly defeat the scheme of the will. By the will, the two brothers and sister take the whole estate, except a small amount of personal property, and an annual payment of $3000 to the widow, during her life. With full knowledge that their brother claimed the right to dispose of these lands as he pleased, they suffered him to go to his grave without the slightest warning they intended to make a claim to them, and without giving him an opportunity to make such disposition of his property as he might have deemed prudent, if he had known his right was disputed. They were silent when duty required them to speak; they shall not be allowed to speak now, because justice demands they shall be silent.

It is proper to add, in this connection, it is in evidence, after the will was executed the testator asked his brothers and sister if they were satisfied with the will, and that, thereupon, Mrs. Anderson said, " John, how about the back property ?" to which the testator replied, according to one witness,

"You have all had your shares of that long ago;" and, according to another, he said he would see about that another time, and there the conversation ended. This query was not an assertion of a claim, and to say that, "by back property," the land in controversy, or even the money of the mother, was referred to, would be a simple fancy, or conjecture, quite as likely to fall wide of the truth as to hit it.

The proofs offered in support of the alleged trust remain to be considered. They consist entirely of verbal admissions and declarations, made years ago, by the alleged trustee. No species of evidence is more dangerous. It is fitly characterized by Sir William Grant, in *Lench* v. *Lench*, 10 *Vesey* 517. He says : "There is no material evidence but that of the *cestui que trust*, who is made a competent witness by a release. She swears to no fact or circumstance capable of being investigated or contradicted, but merely to a naked declaration, supposed to have been made by the husband, admitting that the purchase was made with trust money. That is, in all cases, most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides, the slightest mistake, or failure of recollection, may totally alter the effect of the declaration. There are no corroborating circumstances, by any writing under his hand. In most of the cases there has been, at least, something in writing ; some account, by which it appeared that the fund was laid out." Chancellor Kent, in *Boyd* v. *McLean, supra,* is equally emphatic in speaking of the danger of this kind of proof, and says its admission, in cases of this class, tends to perjury, and the insecurity of paper titles.

If William Midmer is a competent witness—it is unnecessary to declare whether he is or not—very little weight can be attached to his evidence. His incongruous position, as well as his interest in the case, must, in the estimation of every fair mind, seriously affect his credibility. Besides, the confused condition of his recollection, his slight appreciation of the force of words, and the very little skill he possesses in

translating the thoughts expressed by others into language of his own, renders him, in my judgment, wholly unreliable as a witness on a question of the kind under consideration.

None of the admissions which relate to the Twenty-eighth street lot, so far as can be ascertained from dates fixed by the witnesses, were made later than 1855 or 1856, more than fifteen years before the witnesses attempted to repeat them in evidence. Now, it seems to me an almost incredible feat for an ordinary memory, after the lapse of fifteen years, to reproduce, with anything like trustworthy accuracy, a conversation occurring under ordinary circumstances, in which the narrator had no special interest, and which he made no effort to retain. It may, perhaps, be done; but when we consider how great the danger is the speaker did not fully and clearly express himself, or that the witness misunderstood him, or has mingled subsequent statements, made by other parties, with the original statement, or that a faded memory, in its effort to reproduce an occurrence long past, has honestly substituted fancy for fact, the probabilities are so great against the reproduction being full, exact, and complete, that I am unwilling, in this case, at least, on such evidence alone, to destroy a formal paper title, which has stood undisputed for nearly twenty years.

There is not a word of evidence in the case showing a conference between the mother and son respecting the money or the property; there is not a scrap of written matter tending, in the slightest degree, to corroborate the parol proof. Both the Twenty-eighth street lot and the lands in New Jersey were conveyed subject to mortgages; the lands in New Jersey were subject to a mortgage when the alleged trustee died. It is not pretended the complainants ever contributed, or were asked to contribute a penny to pay interest or taxes, or claimed any part of the rents, or dividends on the stock, or had possession of any part of the lands.

The proof utterly fails to convince my judgment these lands were held in trust. I shall, therefore, advise a dismissal of the bill, with costs.